| UNITED STATES DISTRICT COURT | FOR PUBLICATION |
| EASTERN DISTRICT OF NEW YORK | |

| UNITED STATES OF AMERICA | |
|---|---|
| - versus - | STATEMENT OF REASONS |
| JAMEL DOSSIE, | 11-CR-237 (JG) |
| Defendant. | |

JOHN GLEESON, United States District Judge:

This case illustrates how mandatory minimum sentences in drug cases distort the sentencing process and mandate unjust sentences. In the substantial percentage of cases in which they apply, they produce a sentencing regime that is worse than the one the Sentencing Reform Act of 1984 was enacted to replace. They make opaque what that law was intended to make transparent. They strip criminal defendants of the due process rights we consider fundamental to our justice system. Most importantly, too many nonviolent, low-level, substance-abusing defendants like Jamel Dossie "lose their claim to a future" – to borrow a phrase from Attorney General Eric H. Holder, Jr. – because lengthy mandatory prison terms sweep reasonable, innovative, and promising alternatives to incarceration off the table at sentencing.

There is no need for new legislation to remedy this state of affairs. The Attorney General himself has it within his power to remedy it. He can do so by

- citing to the ten-year mandatory minimum in an indictment only when the government intends to prove that the defendant occupied a leadership role that warrants a four-level upward adjustment under U.S.S.G. § 3B1.1(a);

- citing to the five-year mandatory minimum only when the government intends to prove a managerial role worthy of a three- or two-level upward adjustment under § 3B1.1(b) or (c); and

- withdrawing the mandatory minimum provision from the case (or reducing it, as the case may be) if the corresponding aggravated role has not been proven by the government or admitted by the defendant.

I respectfully urge the Attorney General to implement such a policy. It is a modest request. It asks only that the Department of Justice ("DOJ") refrain from dictating severe mandatory minimum penalties when it cannot prove by a preponderance of the evidence that the defendant was the kind of drug dealer for whom those penalties were enacted. By ensuring that the harsh, wooden mandatory minimum provisions are employed only in the circumstances to which Congress clearly intended to limit them, the government could reform an aspect of the criminal justice system that is in need of repair. The reform would promote transparency and accountability in sentencing and return to defendants the due process sentencing rights that are snuffed out in cases like this one. Finally, it would be consistent with the Attorney General's public statements about how our criminal justice system ought to treat defendants like Dossie.

A.     *The Mandatory Minimum Sentences in Drug Cases*[1]

    1.     *Why They Were Enacted*

Already engaged in a fervent war on drugs, Congress was galvanized by the tragic death by overdose of University of Maryland basketball star Len Bias on June 19, 1986, and it promptly enacted the Anti-Drug Abuse Act of 1986 ("ADAA"). The ADAA created mandatory minimum sentences and enhanced maximum sentences that have now become central features of our federal sentencing landscape. Despite the speed with which the ADAA was enacted, there is ample evidence from related congressional reports of the purpose of the new enhanced minimum and maximum penalties. The ADAA's five-year minimum sentence, with a maximum enlarged from 20 to 40 years (the "5-to-40 sentence enhancement" or the "five-year mandatory

---

[1] This discussion borrows from *United States v. Vasquez*, No. 09 Crim. 259, 2010 WL 1257359 (E.D.N.Y. Mar. 30, 2010).

minimum"), was specifically intended for the managers of drug enterprises, while the Act's ten-year minimum sentence with life as the maximum (the "ten-to-life sentence enhancement" or the "ten-year mandatory minimum") was intended for the organizers and leaders. The Sentencing Commission's recent report to the Congress on Mandatory Minimum Penalties in the Federal Criminal Justice System provided the following useful summary of that evidence:

> Floor statements delivered by members in support of the [ADAA] and a committee report on a predecessor bill suggest that Congress intended to create a two-tiered penalty structure for discrete categories of drug traffickers. Specifically, Congress intended to link the five-year mandatory minimum penalties to what some called "serious" traffickers and the ten-year mandatory minimum penalties to "major" traffickers. Drug quantity would serve as a proxy for identifying the type of trafficker.
>
> Senator Robert Byrd, then the Senate Minority Leader, summarized the intent behind the legislation:
>
>> For the kingpins – the masterminds who are really running these operations – and they can be identified by the amount of drugs with which they are involved – we require a jail term upon conviction. If it is their first conviction, the minimum term is 10 years. . . . Our proposal would also provide mandatory minimum penalties for the middle-level dealers as well. Those criminals would also have to serve time in jail. The minimum sentences would be slightly less than those for the kingpins, but they nevertheless would have to go to jail – a minimum of 5 years for the first offense.
>
> A report issued by the House Judiciary Subcommittee on Crime following its consideration of a predecessor bill also provides evidence of Congress's intent to establish two tiered mandatory minimum penalties for serious and major traffickers. The Subcommittee determined that the five and ten-year mandatory minimum sentencing structure would encourage the Department of Justice to direct its "most intense focus" on "major traffickers" and "serious traffickers." "One of the major goals of this bill is to give greater direction to the DEA and the U.S. Attorneys on how to focus scarce law enforcement resources."

U.S. Sent'g Comm'n, *Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System* 24 (2011) [hereinafter *Mandatory Minimum Report*] (second alteration in original) (quoting 132 Cong. Rec. 27,193-94 (Sept. 30, 1986); H.R. Rep. No. 99-845, pt. 1, at 11-12 (1986)) (internal footnotes omitted).

2. *The Mistake: Using Drug Quantity as a Proxy for Role*

Most people would agree that the people who lead or manage drug-trafficking businesses deserve severe punishment. But right from the start Congress made a mistake, which is apparent in the statement of Senator Byrd quoted above: The severe sentences it mandated to punish specified *roles* in drug-trafficking offenses were triggered not by role but by drug type and quantity instead. If it wanted the statute to serve its explicitly stated purpose, Congress should have said that an offense gets the 5-to-40 sentence enhancement when the defendant is proved to be a manager of a drug business. Instead, the 5-to-40 sentence enhancement is triggered by offenses involving 28 grams of crack, 100 grams of heroin, or 500 grams of cocaine. 21 U.S.C. § 841(b)(1)(B). And instead of hinging the ten-to-life sentence enhancement on the government's proof of "kingpin" or leadership status, Congress simply used larger drug quantities: 280 grams of crack,[2] 1,000 grams of heroin, or 5,000 grams of cocaine. 21 U.S.C. § 841(b)(1)(A). So if an offense happens to involve a drug type and quantity that triggers an enhancement, *every* defendant involved in that crime, whatever his or her actual role, can be treated as a leader or manager at the option of the United States Attorney.[3]

Drug quantity is a poor proxy for culpability generally and for a defendant's role in a drug business in particular. Senator Byrd's statement that the leaders and managers of drug operations "can be identified by the amount of drugs with which they are involved" was

---

[2] These numbers reflect the current threshold quantities for crack. Before the Fair Sentencing Act of 2010 ("FSA"), P.L. No. 111-220, 124 Stat. 2372, was enacted, an offense involving 50 grams of crack triggered the ten-year mandatory minimum and an offense involving only five grams of crack triggered the five-year mandatory minimum.

[3] A defendant is subject to the mandatory minimum only if the charging instrument puts him on formal notice of it by alleging the requisite type and quantity of drug and citing the relevant penalty provision. *E.g.*, *United States v. Thomas*, 274 F.3d 655, 663 (2d Cir. 2001); *United States v. Gonzalez*, 420 F.3d 111, 115, 130-31 (2d Cir. 2005). Thus, whether a defendant faces a mandatory minimum at all is a matter left to prosecutorial discretion. At any time during a prosecution the government can withdraw its invocation of the mandatory minimum provision, allowing the court to sentence without being bound by it.

incorrect. Compare Defendant A, who organizes a dozen teenagers into a business to distribute cocaine in a New York City housing project and adjacent high school, with Defendant B, an addict who is paid $300 to stand at the entrance to a pier and watch for the police while a boatload of cocaine is offloaded. Defendant A is more culpable, and he is the sort of defendant Congress had in mind when it enacted the ten-to-life sentence enhancement, but he will not face even the 5-to-40 sentence enhancement if the conspiracy is nipped in the bud, before it deals more than half a kilogram of cocaine. Defendant B, on the other hand, qualifies for kingpin treatment and a ten-year mandatory minimum if the prosecutor so chooses, based solely on the amount of cocaine on the boat.

Congress's mistake of equating drug quantity with a defendant's role in the offense need not continue to have the devastating consequences on display in this case. If DOJ invokes the harsh sentence enhancements only in cases in which the defendants have supervisory roles – always fewer than 10% of federal drug cases – such unintended and unjust results can be avoided in the future. However, as discussed below, in deploying the mandatory minimum penalties, DOJ has disregarded their purpose. It has turned a law that sought to impose enhanced penalties on a select few into a sentencing regime that imposes them on a great many, producing unfairly harsh consequences that Congress did not intend.

        3.       *How DOJ Uses the Mandatory Minimum Provisions*

DOJ uses mandatory minimum sentences without regard to their purpose. In fiscal year ("FY") 2011, over 74% of crack defendants faced a mandatory minimum, *see* U.S. Sent'g Comm'n, 2011 Sourcebook of Federal Sentencing Statistics tbl.44 (2011) [hereinafter 2011 Sourcebook], yet only 5.4% of them occupied an aggravating role of leader or manager of a drug

business, *see id.* tbl.40.[4] Thus, the overwhelming majority of crack defendants who feel the pain of mandatory prison terms are not the criminals Congress had in mind in creating those penalties. The "safety valve" provision that was supposed to save minor defendants from the two-by-four that a mandatory minimum becomes on sentencing day has too many conditions to be effective. Even though more than 94% of crack defendants have no leadership or managerial role, fewer than 10% of such defendants qualify for the safety valve, *see id.* tbl.44.

B.   *Jamel Dossie and His Offense of Conviction*

Jamel Dossie is a young, small-time, street-level drug dealer's assistant. No one could reasonably characterize him as a leader or manager of anything, let alone of a drug business. Like many young men in our community, he was in the drug business because he is a drug user.

Dossie was born in the Brownsville section of Brooklyn. His father's illegal drug use caused a split with his mother before Dossie was even born; Dossie saw his father only three times per year before his father died in 2009. Dossie's mother was (and still is) a bus driver, and she raised Dossie and his two siblings by herself.

By the time Dossie began high school, he was already abusing drugs and alcohol, which got him into trouble regularly. Finally, at age 16, a family court judge ordered him out of his home and into a residential substance abuse treatment program at Phoenix House in the Bronx. Phoenix House reports that Dossie "displayed a poor attitude and unwillingness to engage in treatment" and that he made little academic or clinical progress before his discharge a year later. He never returned to school.

Dossie has a typical criminal history for a young man with his background. A car stop in 2008 led to a simple possession (of marijuana) conviction, and in 2010 he was convicted of a

---

[4]   The table reports the number and percentage of defendants who received an aggravating role adjustment under U.S.S.G. § 3B1.1.

misdemeanor for possessing heroin and crack. His sentences for those misdemeanors were only seven days in custody and probation, respectively, but each conviction nevertheless earned Dossie a criminal history point, terminating any chance he had for safety-valve relief even without considering the two additional points he got for committing his offense while on probation. *See* 18 U.S.C. §3553(f).[5] Dossie has no history of violence except as a victim; he was hit in the leg by a stray bullet while walking down the street in 2008.

Dossie on four occasions was a go-between in hand-to-hand crack sales. On April 15, 2010, when Dossie was 20 years old, a confidential informant made a recorded phone call to him and asked about buying crack. Later that day, the informant met Dossie in Brooklyn. Dossie called an unidentified supplier, who arrived by Mercedes Benz ten minutes later. The informant gave $440 to Dossie – $420 for the person in the Mercedes and $20 for Dossie. Dossie took the money into the car. When he got out, the car left, and then Dossie handed the informant 9.4 grams of crack. On April 29, 2010, they did the same thing, except this time it was $860 ($820 for the supplier, $40 for Dossie) for 15.6 grams. This was less crack than the informant had asked for; Dossie explained that the supplier didn't have enough crack and returned $120 to the informant.

On June 10, 2010, they did it again, except this time the supplier of the crack stayed in a nearby store instead of a car, and it was $1,140 ($1,100 for the supplier and $40 for Dossie) for 29.6 grams. Finally, on November 9, 2010, Dossie transferred to the informant 33.5 grams of

---

[5] The Sentencing Commission has recommended that Congress "consider marginally expanding the safety valve at 18 U.S.C. § 3553(f) to include certain non-violent offenders who receive two, or perhaps three, criminal history points." *Mandatory Minimum Report* at xxxi; *accord id.* at 355-56. This recommendation is too tepid, given how easy it is for nonviolent offenders to rack up criminal history points, especially while under supervision, *see* U.S.S.G. § 4A1.1(d).

7

crack for $1,225. Dossie was arrested three and one-half months later, and he subsequently pled guilty to conspiring to distribute crack.

In sum, Dossie sold a total of 88.1 grams, or 3.1 ounces, of crack. His sole function was to ferry money to the supplier and crack to the informant on four occasions for a total gain to himself of $140.[6]

Dossie's advisory Guidelines range was 57-71 months.[7] That range is too severe for a low-level addict selling drugs on the street. As discussed in *Vasquez*, the drug-offense Guidelines ranges are excessively severe. In formulating those ranges, the Commission decided to jettison its pre-Guidelines data and instead chose to make the sentencing range in every single drug case proportional to the onerous mandatory sentences meant only for leaders and managers.

Despite the harsh Guidelines range, Dossie would have had access to justice if he had not been charged with the five-year mandatory minimum enacted for drug business managers. But he caught two bad breaks. First, as the prosecutor pointed out at his sentencing, two of his four crack sales happened to exceed the threshold quantity of 28 grams that can trigger the five-year mandatory minimum. They only barely exceeded it – sales three and four put Dossie in mandatory minimum territory by only 1.6 and 5.5 grams, respectively – but just as baseball is a game of inches, our drug-offense mandatory minimum provisions create a deadly serious game of grams. The conspiracy charge to which Dossie pled guilty also aggregates all 88.1 grams, rendering him eligible for the mandatory minimum on that basis as well.

---

[6] The amounts paid to Dossie are detailed in the Complaint, ECF No. 1. Since the Complaint does not describe the last of the four transactions, I am assuming here that Dossie received $40 for that transaction as well, as it is comparable to the second and third sales, from which he received $40 each.

[7] Dossie's base offense level was 26 and, although he received a three-level reduction for acceptance of responsibility, he was ineligible for any other adjustments. Because Dossie had two misdemeanor convictions and was on probation when he committed his offense, he fell into Criminal History Category III. The range for Offense Level 23 in Criminal History Category III is 57-71 months.

Dossie's second bad break occurred when the government chose to cite the mandatory minimum provision in the indictment. If it hadn't, I would have been permitted, indeed obligated, to consider, among others, the facts that (1) Dossie had a very minor role in the offense; (2) the drugs he helped to sell weren't his, and he got hardly any money for his involvement; (3) Dossie got off to a very rocky start in life – there's no surer sign of a dysfunctional childhood than a family court judge ordering a 16-year-old out of his home and into a residential drug treatment program; (4) Dossie's criminal record and unsuccessful drug treatment suggest strongly that his legal problems all arose from a drug problem he developed as a child; (5) Dossie is from a very supportive family – his family made all of his court appearances – which could very well have provided the support he needs to get and remain drug-free; and (6) Dossie is genuinely remorseful. I would have considered all of these factors in sentencing Dossie, and there is no way I would have sentenced him to a prison term within the severe advisory range. I might even have given him the chance to enter our Court's Pretrial Opportunity Program, which would have given Dossie the chance to both conquer his substance abuse problem and avoid prison altogether.[8]

Instead, we had a "sentencing proceeding" that involved no written submissions, no oral advocacy, and no judging. The defense lawyer stated the obvious: The five-year mandatory minimum was more than necessary to properly punish Dossie. The prosecutor agreed that the mandatory minimum of five years should be the sentence. So that was the sentence. The

---

[8] The Pretrial Opportunity Program is designed for nonviolent defendants with documented substance abuse problems. Participating defendants have their sentences postponed to engage in drug treatment that involves monthly meetings with the sentencing judge and the Chief Magistrate Judge of the district. The program relies on drug court methodologies that have been proven successful in many state criminal justice systems. If the defendant successfully completes the program by, *inter alia*, staying drug-free for at least one year, the post-arrest rehabilitation is considered by the sentencing judge. For a description of the program, see U.S. Pretrial Servs. Agency, E.D.N.Y., Pretrial Opportunity Program (2012), *available at* http://www.nyed.uscourts.gov/pub/docs/local/POPDescription01112012.pdf.

9

proceeding had all the solemnity of a driver's license renewal and took a small fraction of the time.

C.  *The Evils of Mandatory Minimum Sentencing*

When I observed at Dossie's sentencing that the five-year mandatory minimum was being used by the government to overly punish a defendant for whom it was not intended, the prosecutor assured me that there were "other factors" that justified the mandatory five-year penalty. Specifically, the colloquy went as follows:

| | |
|---|---|
| The Court: | He's not a kingpin or a manager, he's a street-level dealer, and one would think that if a 60-month sentence were appropriate you'd talk the judge into it rather than bind the judge into it. I think it's an inappropriate exercise of discretion given the purpose of these laws. |
| The Prosecutor: | Well, I think in terms of the exercise of discretion, I don't think that the only question from the office's perspective is what the quantity involved is. I think there are a lot of other factors and information that go into it. And because we're not relying on any of that at sentencing I wouldn't necessarily belabor it, but I think there are other factors that go into a charging decision and I can represent to the Court that there are besides just mere quantity. |

Sentencing Transcript at 7.

As this dialogue exemplifies, the use of these mandatory minimum provisions – which were utilized in over 74% of all crack cases in FY 2011, *see* 2011 Sourcebook tbl.44 – results in a sentencing process that is far more objectionable and dangerous than the regime the Guidelines were created to replace. It is true that the pre-Guidelines regime was a "wasteland" characterized by unexplained, unguided, and unreviewed sentencing discretion, Marvin E. Frankel, *Lawlessness in Sentencing*, 41 U. Cin. L. Rev. 1, 54 (1972); *see also* Kate Stith and José A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 172 (1998) ("What made sentencing authority truly extraordinary . . . was not the broad discretion the judge

10

exercised, but rather, the fact that his decision was virtually unreviewable on appeal."), but at least the discretion was exercised by a *judge*, whose mission was to impose a just sentence.  The sentencing discretion in Dossie's case was exercised by one of the parties to the case, in furtherance of the undisclosed interests of law enforcement.

Moreover, even the harshest critics of the Guidelines acknowledge that one of their greatest accomplishments is transparency.  Judges now must follow established procedures and explain the reasons for their sentences.  Those procedures, together with the reasons for the sentence and the sentence itself, are all subject to appellate review.  This case reveals how mandatory-minimum provisions create the ultimate opaque sentencing regime:  No explanation is required for why Dossie must do five years, none of the "factors" that went into the selection of that sentence was offered, and appellate review is impossible.

When I pressed the government further, the prosecutor reluctantly implied that the decision to charge Dossie with the mandatory minimum might have related to "information that . . . link[s] him to a gang."  Sentencing Transcript at 9.  I agree that if Dossie were dealing drugs as his way of participating in a gang, that would be a relevant, aggravating sentencing consideration.  I think any judge would want to know facts like what sort of gang it was, what Dossie's alleged link to it was, how long any such link lasted, and how Dossie's actions as a middleman in street-level drug deals were related to the gang.  But in this respect as well, Dossie's case places in clear relief the insidious consequences of mandatory sentencing provisions.  If not for the mandatory minimum, Dossie would have had the opportunity to contest the government's suggestion that his offense was gang-related, and the government would have had the obligation to prove it.

Coincidentally, the case that was called for sentencing immediately before Dossie's involved a closely analogous situation. The government contended that the defendant committed the extortion to which he had pled guilty as his way of participating in the Genovese crime family. I agreed that such a fact, if proven, would aggravate the sentence. But the defendant denied the allegation, so I scheduled a sentencing hearing to give the government the opportunity to prove it. *See* Minute Entry of Feb. 17, 2012, *United States v. Caramanica*, No. 11 Crim. 26, ECF No. 102. That's how our system is supposed to work; if facts material to the sentencing are in dispute, they get resolved after both sides have notice of them and an appropriate opportunity to be heard. Where the fact in dispute would aggravate the sentence, the government bears the burden of persuasion. These are basic tenets of due process.

Mandatory minimum sentencing strips all of this away. In Dossie's case, the government's unreviewable decision to invoke the mandatory sentencing provision made the actual facts irrelevant. Dossie might have denied a gang affiliation or that any such affiliation had anything to do with his offense. The government might not have been able to prove its suggestion that Dossie was linked to a gang. Dossie, for all we know, might even have been able to affirmatively disprove the link. But because a mandatory minimum was involved and everyone agreed that Dossie should not be sentenced above that minimum, none of these facts mattered. The government simply dictated a five-year sentence without even having to allege, let alone prove, the aggravating fact that it implied warranted the sentence. There is no fairness in a system that allows that to happen.

D. *The Remedy: The Attorney General Should Use the Drug-Offense Mandatory Minimum Provisions Only Against the Defendants for Whom Congress Intended Them*

Congress should get rid of mandatory minimum sentences generally, but no one


expects that to happen soon. In the meantime, DOJ can and must play the leading role in bringing about needed sentencing reform.[9] DOJ should seek mandatory minimum sentences only in the cases for which Congress intended them: in cases against leaders and managers of drug enterprises, not the low-level drug offenders like Dossie who constitute the bulk of the federal drug docket. Federal prosecutors should exercise their discretion to bring mandatory minimum charges against only the small percentage of drug defendants (less than 6% in FY 2011) who deserve the aggravating role adjustments for being leaders or managers in a drug business. Specifically, they should charge the ten-year mandatory minimum only when they intend to prove that the defendant occupied a leadership role that warrants a four-level upward enhancement under U.S.S.G. § 3B1.1(a). They should charge the five-year mandatory minimum only when they intend to prove a managerial role worthy of a three- or two-level upward enhancement under § 3B1.1(b) or (c). And if the relevant aggravating role is not proved or admitted during the sentencing proceeding, prosecutors should withdraw (or reduce, as the case may be) the mandatory minimum.

Section 3B1.1 of the Sentencing Guidelines states:

Based on the defendant's role in the offense, increase the offense level as follows:

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

---

[9] If the long road to the FSA taught us anything, it taught us that DOJ can play precisely such a role. With the passage of the FSA, Congress finally jettisoned the infamous 100:1 ratio, by which a single gram of crack was treated for sentencing purposes as the equivalent of 100 grams of powder cocaine. Congress made this important change only after DOJ told the Senate Judiciary Committee that "fundamental fairness in our sentencing laws" required it to eliminate entirely the sentencing disparity between powder cocaine and crack offenses. *See* Lanny A. Breuer, Assistant Attorney Gen., Crim. Div., U.S. Dep't of Justice, Statement Before the U.S. Senate Comm. on the Judiciary, Subcomm. on Crime & Drugs (Apr. 29, 2009). Although Congress failed to eliminate the deeply unjust disparity, DOJ's leadership prompted Congress to reduce the 100:1 ratio to 18:1.

(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

The four-level adjustment under subsection (a) for organizers and leaders of drug businesses that involve five or more people (including the defendant) or are "otherwise extensive" dovetails with Senator Byrd's description of the defendants who deserve the ten-year mandatory minimum as "kingpins" and "masterminds," as well as with the House committee report's description of them as "major traffickers." The three-level adjustment under subsection (b) for managers and supervisors in such organizations similarly parallels the "middle-level dealers" or "serious traffickers" at whom the five-year mandatory minimum was directed. Finally, the two-level adjustment under subsection (c) that applies to *all* management personnel (organizers, leaders, managers, and supervisors) when the drug business involves fewer than five people and is not otherwise extensive also captures the type of defendant for whom Congress intended the five-year mandatory minimum. Even the founder and leader of a drug business that involves fewer than five people and is not extensive is not the "kingpin" or "major trafficker" Congress had in mind. Thus by following my proposal, DOJ could ensure that its use of mandatory minimum charges hews closely to Congress's intentions.

    My request is also consistent with the Attorney General Holder's policy on charging and sentencing. Under that policy, a prosecutor's charging decision "must always be made in the context of an individualized assessment of the extent to which particular charges fit the specific circumstances of the case." Memorandum from Eric H. Holder, Jr., U.S. Attorney Gen., to All Fed. Prosecutors 2 (May 19, 2010) (quoting U.S. Attorneys' Manual § 9-27.300) (internal quotation marks omitted). Furthermore, the policy provides that "[i]n all cases, the charges

should fairly represent the defendant's criminal conduct." *Id.* And, most importantly, the policy requires that "the decision whether to seek a statutory sentencing enhancement should be guided by these same principles." *Id.* By utilizing mandatory minimum provisions only in cases involving managerial-type drug traffickers as I propose, prosecutors can better ensure that their charging decisions fit the specific circumstances of defendants' cases and that punishments defendants receive fairly represent their criminal conduct.

      I am mindful of the fact that federal prosecutors find significant value in the way that charging mandatory minimum sentences helps them solicit the cooperation of defendants. *See* Lanny A. Breuer, *The Attorney General's Sentencing and Corrections Working Group: A Progress Report*, Fed. Sent'g Rep., Dec. 2010, at 110, 112 ("We favor mandatory minimum sentences because such sentences remove dangerous offenders from society, ensure just punishment, and are an essential tool in gaining cooperation from members of violent street gangs and drug distribution networks."). I have previously written about the "enormous boost" mandatory minimum sentences give to federal law enforcement in its effort to advance investigations and obtain convictions by enlisting cooperation. John C. Jeffries, Jr. & John Gleeson, *The Federalization of Organized Crime*: *Advantages of Federal Prosecution*, 46 Hastings L.J. 1095, 1120 (1995). Federal prosecutors have gotten so inured to using severe sentences to leverage cooperation that, "[t]o an increasing degree, the Department has come to justify its requests for tougher sentencing rules, not on the ground that offenders actually deserve the higher sentences, but simply because the threat of the higher sentence provides a greater inducement for defendant cooperation." Frank O. Bowman, *Mr. Madison Meets a Time Machine: The Political Science of Federal Sentencing Reform*, 58 Stanford L. Rev. 235, 252 (2005).

An interest in pursuing cooperation justifies charging leaders and managers of drug enterprises with the corresponding mandatory minimum drug offense. Though deserving of stiff sentences, such defendants may properly be rewarded with a sentence below the mandatory minimum for providing substantial assistance to the government. *See United States v. Ross*, 719 F.2d 615, 623 (2d Cir. 1983) (Friendly, J., concurring in part and dissenting in part) ("[T]he ability to offer leniency in return for cooperation is an indispensable tool of law enforcement."). The flip side is that a decision not to cooperate may effectively result in a harsher sentence, but a harsh sentence is what Congress intended for that type of drug trafficker.

That same interest in pursuing cooperation cannot justify charging a mandatory minimum when the defendant is neither a leader nor a manager. It is one thing to lower an otherwise appropriate sentence to reward a defendant's cooperation but quite another to threaten to impose an otherwise unjust sentence if he decides not to cooperate or tries but produces no law enforcement results. The latter situation essentially converts a refusal or inability to cooperate into an aggravating sentencing factor, in violation of a basic principle of our sentencing regime. *See* U.S.S.G. § 5K1.2 ("A defendant's refusal to assist in the investigation of other persons may not be considered as an aggravating sentencing factor.").

I have reason to believe that Attorney General Holder will be receptive to my request. In 2009 he made the following remarks to the Vera Institute of Justice:

> One specific area where I think we can do a much better job by looking beyond incarceration is in the way we deal with non-violent drug offenses. We know that people convicted of drug possession or the sales of small amounts of drugs comprise a significant portion of the prison population. Indeed, in my thirty years in law enforcement, I have seen far too many young people lose their claim to a future by committing non-violent drug crimes.
>
> One promising, viable solution to the devastating effect of drugs on the criminal justice system and on American communities is the implementation of more drug treatment courts. Drug court programs provide an alternative to incarceration for non-violent

> offenders by focusing on treatment of their underlying addiction. Program participants are placed in treatment and routinely tested for drug use – with the imposition of immediate sanctions for positive tests balanced with suitable incentives to encourage abstinence from drug use. These programs give no one a free pass. They are strict and can be extraordinarily difficult to get through. But for those who succeed, there is the real prospect of a productive future.
>
> New York has been a leader in this area, diverting some non-violent offenders into drug court programs and away from prison, and extending early release to other non-violent offenders who participate in treatment programs. And while national prison populations have consistently increased, in New York the state prison population has dropped steadily and has 12,000 fewer inmates now than it did in 1999. And since 1999, the overall crime rate in New York has dropped 27%. Other states have followed New York's example. And most importantly, studies show significant reductions in re-arrests, from about 15 to 30 percentage points, for drug-court participants as compared to criminals simply incarcerated.

Eric H. Holder, Jr., U.S. Attorney Gen., Keynote Address at Vera Institute of Justice (July 9, 2009).

Those remarks preceded the crime in this case, but they may as well have been about Dossie, a young drug-user whose nonviolent drug offense now seriously threatens his "claim to a future" principally because the government forced me to impose a five-year jail term on him. The Attorney General was right to compliment the forward-looking approach of the state authorities here in New York. If Dossie had been prosecuted by them instead of by federal authorities he would have been given an opportunity to avoid not only time in jail but a conviction as well. The success of the Drug Treatment Alternative to Prison Program ("DTAP") in Brooklyn over the past twenty years proves the efficacy of treating defendants like Dossie rather than subjecting them to prison terms. Graduates of DTAP "have a five-year post-treatment recidivism rate that is almost half the rate for comparable offenders who served time in

17

prison." Charles J. Hynes, Kings Cnty. Dist. Attorney, Drug Treatment Alternative-to-Prison Twentieth Annual Report at Exec. Summ. (2011).[10]

Indeed, many of the states that ventured into determinate (and more severe) sentencing at around the same time the federal system did have long since figured out how ineffective and expensive it is to reflexively incarcerate nonviolent, substance-abusing defendants like Dossie. As a former Republican member of Congress testified last year before a subcommittee of the House Committee on Appropriations, drug courts are proven solutions – from both the fiscal and public-safety perspectives – to the problems created by substance abusers committing crimes. Drug courts and other alternatives to incarceration reduce substance abuse and crime more effectively and much less expensively than incarceration, probation, or treatment programs not involving judicial participation. Jim Ramstad, Senior Policy Advisor, Nat'l Assoc. of Drug Ct. Professionals, Testimony to U.S. House of Reps., Comm. on Appropriations, Subcomm. on Commerce, Justice, Sci., & Related Agencies (Mar. 11, 2011).

But the benefits of drug treatment and drug courts as alternatives to incarceration for nonviolent offenders are unavailable when DOJ itself *mandates* incarceration by invoking mandatory minimum sentences. Those provisions continue to be routinely invoked by DOJ against nonviolent, low-level offenders, even though it is crystal clear that Congress did not intend them to be used against such defendants. The result: Judges are removed from the sentencing process, along with transparency, appellate review, and, most importantly, justice.

---

[10] Ironically, Dossie is such a low-level drug defendant that he would not even be eligible for admission into the DTAP Program, which requires at least one prior felony drug conviction. However, he would be "eligible to be diverted into treatment through the court-run programs in Brooklyn's three drug court parts: Misdemeanor Brooklyn Treatment Court, Brooklyn Treatment Court, and the Screening and Treatment Enhancement Part." *Id.* at 4 n.9.

18

And young men like Jamel Dossie end up losing out on what may be their last chance to save their future.

E.      *Conclusion*

The only reason for the five-year sentence imposed on Dossie is that the law invoked by the prosecutor required it.  It was not a just sentence.  To avoid similar injustices in other cases, I respectfully urge the Attorney General to lead the way forward by altering DOJ's charging policies in the manner described above.

                                                                                    John Gleeson, U.S.D.J.

Dated:  March 30, 2012
            Brooklyn, New York